Barry I. Levy, Esq.
Max Gershenoff, Esq.
Peter Henninger, Esq.
RIVKIN RADLER LLP
926 RXR Plaza,
Uniondale, NY 11553
(516) 357-3000
max.gershenoff@rivkin.com

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General Insurance
Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY COMPANY,<br><br>Plaintiffs,<br><br>-against-<br><br>STAR MEDICAL DIAGNOSTIC, P.C., NEW YORK MEDICAL & DIAGNOSTIC CARE, P.C., PERVAIZ QURESHI, M.D., ROBERT SOLOMON, M.D., NAIYER IMAM, M.D., and SASAN AZAR, M.D.,<br><br>Defendants. | Docket No.: _____ ( )<br><br>**Plaintiffs Demand a Trial by Jury** |

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

1

**NATURE OF THE ACTION**

1.      This action seeks to recover more than $9,500,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent, unlawful, and non-reimbursable no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Star Medical Diagnostic, P.C. ("Star Medical") and New York Medical & Diagnostic Care, P.C. ("New York Medical"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable radiology services including magnetic resonance imaging ("MRIs")(collectively the "Fraudulent Services"), that purportedly were provided to New York automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.      In addition, GEICO seeks a declaration that – at all relevant times – Star Medical and New York Medical were not in compliance with all significant laws and regulations governing health care practice, including licensing laws, and are not entitled to collect on any of their outstanding billing to GEICO, because of the fraudulent and unlawful activities described herein.

3.      As set forth below, Defendants at all relevant times have known that:

(i)      the Fraudulent Services provided through Star Medical and New York Medical were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants and others, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)     in many cases, the Fraudulent Services at Star Medical and New York Medical were never legitimately provided in the first instance;

(iii)    in many cases, the Fraudulent Services were ineligible for reimbursement because they were performed – to the extent that they were performed at all – by independent contractors, rather than by Star Medical and New York Medical's employees; and

(iv)     neither the Defendants, nor the Fraudulent Services, were in compliance with all significant laws and regulations governing health care practice in New York, including licensing laws.

2

4.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through Star Medical and New York Medical to GEICO.

5.      The charts annexed hereto as Exhibits "1" and "2" set forth a large and representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO for the Fraudulent Services.

6.      The Defendants' fraudulent and unlawful scheme began as early as 2019 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $9,500,000.00.

## THE PARTIES

### I.      Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. Plaintiffs are authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

8.      Defendant Star Medical is a New York medical professional corporation with its principal place of business in New York, and was incorporated on or about January 31, 2020.

9.      Star Medical purports to be owned and controlled by Pervaiz Qureshi, M.D. ("Qureshi") and Robert Solomon, M.D. ("Solomon"), and has been used as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers in New York.

10.      Defendant New York Medical is a New York medical professional corporation with its principal place of business in New York, and was incorporated on or about February 9, 2016.

11.     New York Medical purports to be owned and controlled by Qureshi and Solomon, and has been used as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers in New York.

12.     Defendant Qureshi resides in and is a citizen of New York. Qureshi is a physician who was licensed to practice medicine in New York on or about July 1, 1994. Qureshi is an internist, not a radiologist.

13.     At all relevant times, Qureshi has purported to be the majority owner of Star Medical and New York Medical, and purports to own 95% of each practice.

14.     Defendant Solomon resides in and is a citizen of New York. Solomon was licensed to practice medicine in New York on or about October 31, 1989, and is a radiologist.

15.     Solomon purportedly owns 5% of both Star Medical and New York Medical and purported to perform many of the Fraudulent Services on behalf of Star Medical and New York Medical.

16.     Defendant Naiyer Imam, M.D. ("Imam") resides in and is a citizen of New Jersey. Iman was licensed to practice medicine in New York on or about May 23, 2002, and is a radiologist.

17.     Imam purported to perform many of the Fraudulent Services on behalf of Star Medical and New York Medical, and also purported to be a minority owner of Star Medical from January 2020 to September 2021, and of New York Medical from February 2016 to September 2021.

18.     Over the course of at least 2019-2021, Imam was subjected to professional discipline in various states where he was licensed to practice medicine, including Minnesota, California, Maryland, North Carolina, Arizona Illinois, Mississippi, Texas, Florida, Michigan, and

Massachusetts, after he was found to have engaged in conduct with respect to a patient that failed to conform to the minimal standards of acceptable and prevailing medical practice. Upon information and belief, Imam's history of professional discipline – which can be located by prospective patients, employers, and referral sources via an Internet search – has made it difficult for him to find legitimate employment as a physician and contributed to his motive to participate in the fraudulent and unlawful scheme described herein.

19.     Defendant Sasan Azar, M.D.("Azar") resides in and is a citizen of New York. Azar was licensed to practice medicine on or about November 8, 1993, and is a radiologist.

20.     Azar purported to perform many of the Fraudulent Services on behalf of Star Medical and New York Medical.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

22.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

23.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

25.    For example, the Defendants submitted or caused to be submitted a large amount of fraudulent billing to GEICO under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds. In reliance on the fraudulent claims, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

26.    What is more, and as set forth herein, the Defendants transacted substantial business in New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

27.    Moreover, and as set forth herein, the Defendants regularly committed tortious acts within the Eastern District of New York that caused injury to GEICO.

## ALLEGATIONS COMMON TO ALL CLAIMS

28.    GEICO underwrites automobile insurance in New York.

**I.    An Overview of the Pertinent New York Law Governing No-Fault Insurance Reimbursement**

29.    New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

30.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(the "No-Fault Law"), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" or "PIP Benefits") to Insureds.

31.    In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

32.     In New York, an Insured can assign their right to PIP Benefits to health care goods and services providers in exchange for those services.

33.     In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3") or by using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

34.     Pursuant to the No-Fault Law, health care services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

35.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

36.     New York law prohibits licensed health care services providers, including licensed physicians and medical practices, from paying or accepting compensation in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530; 6531; see also 8 N.Y.C.R.R. § 29.1. Health care providers that pay or receive kickbacks or unlawful compensation of any kind in exchange for patient referrals are not eligible to receive PIP Benefits.

37.    Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

38.    Therefore, under the No-Fault Law, a professional corporation is not eligible to receive PIP Benefits if it is owned by a person who does not actually practice their profession through the corporation.

39.    Pursuant to the No-Fault Law, only health care services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits. There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or their health care services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law…

40.    Accordingly, for a health care services provider to be eligible to bill for and to collect PIP Benefits in New York, it must be the actual provider of the underlying health care services. Under the No-Fault Law, a health care services provider is not eligible to collect PIP Benefits for health care services rendered by individuals, such as independent contractors, who are not employees of the health care services provider.

41.    In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

42.    When a health care services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent

manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

43.    Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a health care services provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

44.    Beginning no later than 2019, and continuing through the present day, the Defendants conceived and implemented a fraudulent scheme in which they caused a massive amount of fraudulent and unlawful PIP billing to be submitted to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services in New York.

## A.    The Unlawful Operation of Star Medical and New York Medical in Violation of N.Y. Business Corporation Law § 1507

45.    As set forth above, N.Y. Business Corporation Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed. Section 1507 provides as follows:

> *Issuance of shares*
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

46.     Legislative history confirms that a medical professional corporation's putative physician-owners not only must be licensed to practice medicine but must also be engaged in the practice of medicine through the medical professional corporation. For example, in commenting on the proposed amendment to Section 1507 in 1971, the State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

47.     Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.

48.     New York's Department of Health was of the same opinion, commenting that;

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged…. (Emphasis added.)

49.     Nonetheless, Qureshi has not legitimately engaged in the practice of medicine through Star Medical and New York Medical as required by New York law.

50.     In fact, Qureshi gave testimony during an examination under oath ("EUO") in which he indicated that he does not perform any medical services through New York Medical as required by New York law.

51.     Additionally, Qureshi does not supervise any of the treatment or services that allegedly are provided to patients of Star Medical and New York Medical. Nor does Qureshi train any of the medical professionals that allegedly provide medical services for Star Medical and New York Medical.

52.     Qureshi has never been qualified to provide and/or supervise the Fraudulent Services that were allegedly provided by the medical professionals associated with Star Medical and New York Medical, and billed to GEICO.

53.     For example, Qureshi is a physician who purports to specialize in internal medicine, and has neither the training nor the expertise to perform or supervise the purported radiology services billed through Star Medical and New York Medical to GEICO.

54.     In the claims identified in Exhibits "1" and "2", the Defendants falsely represented that Star Medical and New York Medical were eligible to collect PIP Benefits, when in fact they were not because they operated in violation of N.Y. Business Corporation Law § 1507.

**B.     The Fraudulent and Unlawful Billing for Independent Contractor Services**

55.     The Defendants' fraudulent scheme also included submission of claims to GEICO on behalf of Star Medical and New York Medical seeking payment for services provided by independent contractors.

56.     As set forth above, under the No-Fault Law, health care providers are ineligible to bill for or receive payment for health care services that are performed by independent contractors – the health care services must be performed by the health care providers, themselves, or by their employees.

57.     According to testimony given by Qureshi during an EUO, Star Medical and New York Medical have utilized the services of at least five purported MRI technicians since 2022, including individuals named Malik Awan ("Awan"), Jigar Patel ("Patel"), Hilal Yousaf ("Yousaf"), Berry Terkin ("Terkin"), and Ronald Beauge ("Beauge") (collectively the "Technicians").

11

58.     The Technicians and every other MRI technician associated with Star Medical and New York Medical were never employed by Star Medical or New York Medical – rather, they were independent contractors.

59.     For instance, Star Medical and New York Medical:

(i)     permitted the Technicians to set their own schedules and days on which they desired to perform services;

(ii)    permitted the technicians to maintain non-exclusive relationships and perform services for their own practices and on behalf of other, competing health care providers;

(iii)   failed to provide the Technicians with any sort of employment agreement; and

(iv)    failed to provide any supervision to the Technicians by any medical doctor capable of supervising the performance of MRIs.

60.     Because the Technicians were independent contractors, the Defendants never had any right to bill for or collect PIP Benefits in New York in connection with their services.

61.     Even so, the Defendants routinely billed for the Fraudulent Services in New York, and sought payment under the New York No-Fault Laws and GEICO's New York PIP insurance policies, as if the Fraudulent Services had been provided by an actual employee of Star Medical or New York Medical to make it appear as if the services were eligible for PIP reimbursement.

62.     The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**C.    The Defendants' Unlawful Compensation in Exchange for Patient Referrals and Fraudulent and Unlawful Billing for Medically Unnecessary MRIs**

63.     The Defendants' ability to bill GEICO and other insurers depended upon their ability to gain access to Insureds.

64.     However, in the claims identified in Exhibits "1" and "2", the Insureds generally did not require MRIs, because they had been involved in relatively minor, low-speed, low-impact accidents, which did not cause them to experience any injuries that would warrant MRIs.

65.     Rather, to the extent that the Insureds in the claims identified in Exhibits "1" and "2" suffered any injuries at all in their typically-minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains, strains, or contusions.

66.     In a legitimate clinical setting, MRIs should not be used as an initial form of diagnostic imaging in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

67.     For example, the American College of Radiology – an almost 100 year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science and professions of radiological care – has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

68.     Along similar lines, the American College of Physicians – a more than 100 year-old professional organization with a mission to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine – likewise has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

69.     Moreover, at all relevant times there were many radiology facilities in New York that were able to provide radiology services – including MRIs – to automobile accident victims. These radiology facilities are far more reputable and established than New York Medical and Star Medical, which engaged in the fraudulent and unlawful conduct described herein, are controlled

by Qureshi, who is not even a radiologist, and which have employed and been owned, in part, by Imam, who has a record of professional discipline in numerous states.

70.     The lack of medical necessity for the Defendants' Fraudulent Services, and the plethora of more established and reputable radiology practices in the market, made it difficult for Star Medical and New York Medical to obtain legitimate referrals from legitimate referral sources.

71.     However, there are chiropractors and other health care providers in New York that: (i) purport to provide treatment to patients who are pursuing personal injury lawsuits based on automobile accidents; and (ii) are in a position to make a substantial number of referrals for MRIs and other forms of diagnostic imaging.

72.     These health care providers have an incentive to make it appear as if their patients are seriously injured, when in fact they are not, in order to support the patients' personal injury claims, and to create a false justification for the health care providers to bill for extensive, medically unnecessary "treatment".

73.     Accordingly, the Defendants entered into a secret scheme with their referral sources, whereby they agreed to provide unlawful compensation in exchange for patient referrals from the health care providers and their practices to Star Medical and New York Medical.

74.     In exchange for unlawful compensation from Star Medical, New York Medical, Qureshi, Solomon, and Imam, these health care providers routinely referred Insureds to Star Medical and New York Medical for medically unnecessary MRIs and other radiology services, regardless of the Insureds' individual symptoms, presentation, or – in most cases – the total absence of any continuing medical problems arising from any automobile accident.

75.     As unlawful compensation for the referrals, the Defendants agreed to provide medically unnecessary MRIs to Insureds, and to generate reports which falsely contended that the

Insureds suffered from injuries warranting additional treatment from their referral sources, thereby enabling the referral sources to falsely justify and obtain payment on much more PIP insurance billing than otherwise would have been available to them.

76. The only reason these Insureds were referred to Star Medical and New York Medical for MRIs was because the Defendants were providing the referring health care providers unlawful compensation in exchange for the referrals.

77. For example, the Defendants routinely purported to provide MRIs to Insureds who did not require them.

78. As set forth above, MRIs should not be used as an initial form of diagnostic imaging in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

79. In fact, in a legitimate clinical setting, patients suffering from soft tissue injuries such as strains or sprains secondary to automobile accidents generally should not receive MRIs until they complete a legitimate course of conservative treatment.

80. This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and unnecessary diagnostic imaging can be counterproductive and can even be harmful to the patient.

81. Even so, in order to generate a steady stream of referrals to Star Medical and New York Medical for medically unnecessary MRIs, and as unlawful compensation for the referrals, the Defendants routinely purported to perform and/or provide medically unnecessary MRIs to Insureds as an initial form of diagnostic imaging, soon after the Insureds' underlying automobile accidents. This, despite the fact that the Insureds had not suffered any injuries that would warrant

MRIs, and – in any case – had not, and could not have, legitimately tried and failed a course of conservative treatment at the time when the MRIs purportedly were provided.

82.    For example:

(i)    On November 13, 2019, an Insured named SB was involved in an automobile accident. The contemporaneous police report indicated that SB's vehicle was drivable following the accident. The police report further indicated that SB complained refused medical attention at the scene. In keeping with the fact that SB was not seriously injured, SB did not visit any hospital emergency room following the accident. To the extent that SB experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before SB had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Imam purported to provide and billed GEICO for medically unnecessary MRIs of SB's lumbar spine and cervical spine on December 17, 2019, which was before SB could have failed a legitimate course of conservative treatment.

(ii)    On December 4, 2019, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured as a result of the accident. In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident. To the extent that IK experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before IK had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Imam purported to provide and billed GEICO for a medically unnecessary MRI of IK's cervical spine on January 12, 2020, which was before IK could have failed a legitimate course of conservative treatment.

(iii)    On December 4, 2019, an Insured named KK was involved in an automobile accident. The contemporaneous police report indicated that KK's vehicle was drivable following the accident. The police report further indicated that KK was not injured as a result of the accident. In keeping with the fact that KK was not seriously injured, KK did not visit any hospital emergency room following the accident. To the extent that KK experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before KK had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Imam purported to provide and billed GEICO for a medically unnecessary MRI of KK's cervical spine on January 5, 2020, which was before KK could have failed a legitimate course of conservative treatment.

(iv)    On December 17, 2019, an Insured named ND was involved in an automobile accident. The contemporaneous police report indicated that ND was not injured as a result of the accident. The police report further indicated that ND was not transported

to any hospital emergency department as a result of the accident. To the extent that ND experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before ND had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Imam purported to provide and billed GEICO for medically unnecessary MRIs of ND's cervical spine and lumbar spine on February 1, 2020, which was before ND could have failed a legitimate course of conservative treatment.

(v)     On December 18, 2019, an Insured named MM was involved in an automobile accident. The contemporaneous police report indicated that MM's vehicle was drivable following the accident. The police report further indicated that MM was not injured as a result of the accident. In keeping with the fact that MM was not seriously injured, MM did not visit any hospital emergency room following the accident. To the extent that MM experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before MM had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Imam purported to provide and billed GEICO for medically unnecessary MRIs of MM's cervical spine and lumbar spine on January 27, 2020, which was before MM could have failed a legitimate course of conservative treatment.

(vi)    On December 20, 2019, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured as a result of the accident. In keeping with the fact that MR was not seriously injured, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before MR had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Azar purported to provide and billed GEICO for a medically unnecessary MRI of MR's left knee on January 26, 2020, which was before MR could have failed a legitimate course of conservative treatment.

(vii)   On July 2, 2020, an Insured named DH was involved in an automobile accident. The contemporaneous police report indicated that DH's vehicle was drivable following the accident. The police report further indicated that DH was not injured as a result of the accident. In keeping with the fact that DH not seriously injured, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before DH had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Imam purported to provide and billed GEICO for medically unnecessary MRIs of DH's lumbar spine and cervical spine on August 10, 2020, which was before DH could have failed a legitimate course of conservative treatment.

(viii)   On August 18, 2020, an Insured named GU was involved in an automobile accident. The contemporaneous police report indicated that GU's vehicle was drivable following the accident. While GU visited a hospital emergency room following the accident, the contemporaneous hospital records indicated that GU was treated on an outpatient basis and discharged the same day with no serious injury diagnosis. To the extent that GU experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before GU had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Azar purported to provide and billed GEICO for a medically unnecessary MRI of GU's right knee on August 28, 2020, which was before GU could have failed a legitimate course of conservative treatment.

(ix)   On August 26, 2020, an Insured named QA was involved in an automobile accident. The contemporaneous police report indicated that QA's vehicle was drivable following the accident. While QA visited a hospital emergency room following the accident, the contemporaneous hospital records indicated that QA was treated on an outpatient basis and discharged the same day with no serious injury diagnosis. To the extent that QA experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before QA had failed a course of conservative treatment. Even so, New York Medical, Qureshi, Imam, and Azar purported to provide and billed GEICO for medically unnecessary MRIs of QA's thoracic spine and left shoulder on October 5, 2020, as well as medically unnecessary MRIs of QA's cervical spine and lumbar spine on October 16, 2020, which were before QA could have failed a legitimate course of conservative treatment.

(x)   On October 5, 2021, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured as a result of the accident. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before JS had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and billed GEICO for medically unnecessary MRIs of JS's cervical spine and lumbar spine on November 16, 2021, as well as a medically unnecessary MRI of JS's right shoulder on November 30, 2021, which were before JS could have failed a legitimate course of conservative treatment

(xi)   On November 18, 2021, an Insured named WG was involved in an automobile accident. The contemporaneous police report indicated that WG was not injured as a result of the accident. The police report further indicated that WG was not transported to any hospital emergency department as a result of the accident. To the extent that WG experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before WG had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon

purported to provide and billed GEICO for medically unnecessary MRIs of WG's lumbar spine and cervical spine on December 22, 2021, which was before WG could have failed a legitimate course of conservative treatment.

(xii)    On November 18, 2021, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that MH was not injured as a result of the accident. The police report further indicated that MH was not transported to any hospital emergency department as a result of the accident. To the extent that MH experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before MH had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and billed GEICO for medically unnecessary MRIs of MH's lumbar spine and cervical spine on December 22, 2021, which was before MH had a chance to complete a legitimate course of conservative treatment.

(xiii)    On February 8, 2022, an Insured named DA was involved in an automobile accident. The contemporaneous police report indicated that DA's vehicle was drivable following the accident. While DA visited a hospital emergency room following the accident, the contemporaneous hospital records indicated that DA was treated on an outpatient basis and discharged the same day without any serious injury diagnosis. To the extent that DA experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before DA had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and billed GEICO for medically unnecessary MRIs of DA's cervical spine and lumbar spine on March 14, 2022, as well as medically unnecessary MRIs of DA's left shoulder and right shoulder on March 27, 2022, which were before DA could have completed a legitimate course of conservative treatment.

(xiv)    On February 14, 2022, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured as a result of the accident. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before MG had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and billed GEICO for medically unnecessary MRIs of MG's cervical spine and lumbar spine on March 12, 2022, medically unnecessary MRIs of MG's left shoulder and left knee on March 26, 2022, as well as a medically unnecessary MRI of MG's left elbow on April 9, 2022, which were all before MG could have completed a legitimate course of conservative treatment.

(xv)    On November 4, 2022, an Insured named SB was involved in an automobile accident. The contemporaneous police report indicated that SB's vehicle was drivable following the accident. The police report further indicated that SB was not injured as

a result of the accident. In keeping with the fact that SB was not seriously injured, SB did not visit any hospital emergency room following the accident. To the extent that SB experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before SB had failed a course of conservative treatment. Even so, New York Medical, Qureshi, and Solomon purported to provide and billed GEICO for medically unnecessary MRIs of SB's lumbar spine and cervical spine on December 13, 2022, which was before SB could have failed a legitimate course of conservative treatment.

(xvi)   On May 12, 2023, an Insured named WF was involved in an automobile accident. The contemporaneous police report indicated that WF's vehicle was drivable following the accident. While WF visited a hospital emergency room following the accident, the contemporaneous hospital records indicated that WF was treated on an outpatient basis and discharged the same day without any serious injury diagnosis. To the extent that WF experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before WF had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and billed GEICO for medically unnecessary MRIs of WF's cervical spine and lumbar spine on June 13, 2023, which was before WF could have completed a legitimate course of conservative treatment.

(xvii)   On May 13, 2023, an Insured named DJ was involved in an automobile accident. The police report indicated that DJ's vehicle was drivable following the accident. The police report further indicated that DJ was not injured as a result of the accident. In keeping with the fact that DJ was not seriously injured, DJ did not visit any hospital emergency room following the accident. To the extent that DJ experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before DJ had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and bill GEICO for medically unnecessary MRI of DJ's left knee and left shoulder on June 8, 2023, which was before DJ could have completed a legitimate course of conservative treatment.

(xviii)   On July 12, 2023, an Insured named TW was involved in an automobile accident. The contemporaneous police report indicated that TW's vehicle was drivable following the accident. The police report further indicated that TW was not transported to any hospital emergency department following the accident. To the extent that TW experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before TW had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and billed GEICO for medically unnecessary MRIs of TW's left shoulder and right shoulder on July 31, 2023, medically unnecessary MRIs of TW's cervical spine and lumbar spine on August 17, 2023, and a medically unnecessary MRI of TW's right foot on September 1, 2023, which were all before TW could have completed a legitimate course of conservative treatment.

20

(xix) On November 15, 2023, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that AM was not transported to any hospital emergency department following the accident. To the extent that AM experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before AM had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide, and billed GEICO for a medically unnecessary MRI of AM's right shoulder on December 14, 2023, medically unnecessary MRIs of AM's cervical spine and lumbar spine of December 21, 2023, as well as a medically unnecessary MRI of AM's thoracic spine on January 4, 2024, which were all before AM had a chance to complete any legitimate course of conservative treatment.

(xx) On December 15, 2023, an Insured named NG was involved in an automobile accident. The contemporaneous police report indicated that NG's vehicle was drivable flowing the accident. The police report further indicated that NG was not injured as a result of the accident. In keeping with the fact that NG was not seriously injured, NG did not visit any hospital emergency room following the accident. To the extent that NG experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before NG had failed a course of conservative treatment. Even so, Star Medical, Qureshi, and Solomon purported to provide and billed GEICO for a medically unnecessary MRI of NG's lumbar spine on January 20, 2024, which was before NG could have failed a legitimate course of conservative treatment.

83.    These are only representative examples. In the claims identified in Exhibits "1" and "2", the Defendants routinely purported to perform and/or provide medically unnecessary MRIs to Insureds as an initial form of diagnostic imaging soon after the Insureds' underlying automobile accidents, despite the fact that the Insureds: (i) had not suffered any injuries that would warrant MRIs; and, in any case, (ii) had not, and could not have, legitimately tried and failed a course of conservative treatment.

84.    Moreover, in a legitimate clinical setting, it is improbable – to the point of impossibility – that a large cohort of patients involved in minor automobile accidents not only would suffer injuries to both their cervical <u>and</u> lumbar or thoracic spines as the result of the minor accidents, but would suffer injuries serious enough to genuinely warrant both cervical <u>and</u> lumbar

or thoracic MRIs in the immediate aftermath of the underlying accidents, before the patients had tried and failed a legitimate course of conservative treatment.

85.     Even so – and as set forth above – the Defendants routinely purported to perform and/or provide both cervical and lumbar or thoracic MRIs (as well as other MRIs) with respect to Insureds who had not been seriously injured in their accidents, did not plausibly require both cervical and lumbar or thoracic MRIs (or any MRIs), and in any case did not require cervical and lumbar or thoracic MRIs (or any MRIs) as a first-line diagnostic test, before they had failed a legitimate course of conservative treatment.

86.     The Defendants provided their MRIs pursuant to a fraudulent, pre-determined protocol designed to provide false or exaggerated injury "diagnoses" early on in the Insureds' courses of treatment, so as to create a false justification for continued, medically unnecessary treatment and billing by Star Medical and New York Medical's referral sources, to support the Insureds' personal injury claims, to ensure that Star Medical and New York Medical would continue to receive a steady stream of MRI referrals, and as unlawful compensation for the referrals.

87.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

88.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

89.     It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

22

90.     It likewise is improbable that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology as the result of the accident, but also would require MRIs of the same parts of their bodies as the result of the accident, at or around the same time after the accident.

91.     It is even more improbable – to the point of impossibility – that this legitimately would occur over and over again within a cohort of patients receiving MRIs from a single radiology provider.

92.     Even so – and in keeping with the fact that the Defendants provided their MRIs pursuant to a pre-determined, fraudulent protocol, rather than based on medical necessity, and were engaged in an unlawful referral scheme with their referral sources – the Defendants routinely purported to provide substantially identical, medically unnecessary MRIs, on or about the same date, to two or more Insureds who had been in the same underlying accident, oftentimes before the Insureds legitimately could have tried and failed a course of conservative treatment.

93.     For example:

(i)     On July 23, 2019, two Insureds – AC and AT – were involved in the same automobile accident. AC and AT were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Imam submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of AC on September 9, 2019, and AT on September 12, 2019.

(ii)    On February 21, 2020, two Insureds – RT and FD – were involved in the same automobile accident. RT and FD were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Imam submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of RT and FD on May 13, 2020.

(iii)    On October 19, 2020, two Insureds – HV and JV – were involved in the same automobile accident. HV and JV were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of HV and JV on December 9, 2020.

(iv)    On January 1, 2021, two Insureds – RB and SF – were involved in the same automobile accident. RB and SF were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Imam submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of RB and SF on March 10, 2021.

(v)    On February 18, 2021, two Insureds – SH and MH – were involved in the same automobile accident. SH and MH were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of SH and MH April 7, 2021.

(vi)    On March 30, 2021, two Insureds – OK and DL – were involved in the same automobile accident. OK and DL were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Imam submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of OK and DL on April 23, 2021, and again on May 3, 2021.

(vii)    On May 22, 2021, two Insureds – JG and WG – were involved in the same automobile accident. JG and WG were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, Solomon, and Imam submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of JG and WG on June 25, 2021.

(viii)   On July 27, 2021, two Insureds – SA and SF – were involved in the same automobile accident. SA and SF were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of SA and SF on October 19, 2021.

(ix)   On November 1, 2021, two Insureds – GC and MR – were involved in the same automobile accident. GC and MR were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of GC and MR at Star Medical on February 3, 2022.

(x)   On November 5, 2021, two Insureds – BG and JT – were involved in the same automobile accident. BG and JT were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of BG on December 6, 2021, and JT on December 16, 2021.

(xi)   On February 6, 2022, three Insureds – CM, MS, and AT – were involved in the same automobile accident. CM, MS, and AT were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of CM, MS, and AT at Star Medical on March 7, 2022.

(xii)   On April 3, 2022, four Insureds – TB, MJ, TM, and JP – were involved in the same automobile accident. TB, MJ, TM, and JP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of JP on May 3, 2022; TB on May 5, 2022; TM on May 6, 2022; and MJ on June 1, 2022.

(xiii)    On July 14, 2022, two Insureds – JD and ND – were involved in the same automobile accident. JD and ND were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of JD and ND on August 22, 2022.

(xiv)    On July 24, 2022, <u>three</u> Insureds – AB, HL, and HY – were involved in the same automobile accident. AB, HL, and HY were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of HL and HY on August 25, 2022, and AB on September 2, 2022.

(xv)    On December 4, 2022, two Insureds – ND and AP – were involved in the same automobile accident. ND and AP were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of ND and AP on February 28, 2023.

(xvi)    On March 10, 2023, two Insureds – JL and OM – were involved in the same automobile accident. JL and OM were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, Solomon, and Imam submitted bills to GEICO for MRI scans purportedly performed on the lumbar and cervical spines of JL and OM on April 28, 2023.

(xvii)    On July 11, 2023, two Insureds – AT and KT – were involved in the same automobile accident. AT and KT were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, Solomon, and Imam submitted bills to GEICO for MRI scans purportedly performed on the lumbar and cervical spines of AT and KT on August 9, 2023.

(xviii)   On July 24, 2023, <u>three</u> Insureds – RC, TS, and TS – were involved in the same automobile accident. RC, TS, and TS were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after their accident. Even so, Star Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the cervical and lumbar spines of RC, TS, and TS at Star Medical on August 26, 2023.

(xix)   On July 26, 2023, two Insureds – AL and ER – were involved in the same automobile accident. AL and ER were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Solomon submitted bills to GEICO for MRI scans purportedly performed on the lumbar and cervical spines of AL and ER on September 13, 2023.

(xx)   On September 21, 2023, two Insureds – ES and JS – were involved in the same automobile accident. ES and JS were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were different and resolved at different rates. They did not require substantially identical MRIs on or about the same date after the accident. Even so, New York Medical, Qureshi, and Imam submitted bills to GEICO for MRI scans purportedly performed on the lumbar and cervical spines of JS on November 1, 2023, and ES on November 7, 2023.

94.   These are only representative examples. In the claims identified in Exhibits "1" and "2", the Defendants routinely purported to provide substantially identical, medically unnecessary MRIs on or about the same date to two or more Insureds who had been involved in the same accident, despite the fact that the Insureds were differently situated and did not require the MRIs.

95.   What is more, in a legitimate clinical setting, when properly performed, the MRIs that the Defendants purported to perform and/or provide – typically between 2-4 MRIs per Insured, per date of service, including cervical MRIs, lumbar/thoracic MRIs, shoulder MRIs, and/or knee MRIs – would require the patient to remain still for at least more than an hour.

96.    However, in the claims for multiple MRIs, per Insured, per date of service that are identified in Exhibits "1" and "2", the Defendants did not require the Insureds to remain still for the requisite periods of time so that the MRIs could be legitimately and properly performed. Instead, the Defendants provided their MRIs – to the extent they provided them at all – in an abbreviated, rushed, and assembly-line manner designed to generate as much PIP billing as possible each day, rather than to actually diagnose or treat the Insureds. As a result, the Defendants' MRI studies were performed below the standard of care, typically resulting in false or exaggerated "findings" as set forth herein, and were medically unnecessary.

97.    In the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the underlying MRIs were medically necessary, lawfully provided, and eligible for PIP reimbursement in the first instance.

98.    In fact, the MRIs were neither medically necessary nor lawfully provided. Instead, the MRIs were provided – to the extent they were provided at all – pursuant to a pre-determined protocol designed to maximize the billing the Defendants could submit through Star Medical and New York Medical to GEICO and other insurers, and pursuant to the Defendants' unlawful referral scheme, not to treat or otherwise benefit the Insureds who were subjected to it.

99.    In the claims identified in Exhibits "1" and "2", the Defendants routinely purported to provide medically unnecessary MRIs to Insureds as unlawful compensation to their referral sources, in order to generate a steady stream of medically unwarranted referrals to Star Medical and New York Medical.

100.    Not only did the Defendants routinely bill for medically unnecessary MRIs, but they also routinely misrepresented the purported "results" of the MRIs, in order to make it appear

as if the Insureds had suffered from serious injuries as the result of their automobile accidents, when in fact they had not.

101.    The Defendants issued these false and exaggerated "findings" in order to create the appearance of serious injuries where none actually existed, so as to compensate their referral sources for their referrals to Star Medical and New York Medical for medically unnecessary MRIs.

102.    It is improbable – to the point of impossibility – that a large cohort of patients who were involved in relatively minor accidents not only would suffer disc bulges or herniations as the result of the minor accidents, but would suffer numerous disc bulges or herniations at multiple levels of their spines.

103.    Even so, in the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the Insureds suffered numerous disc bulges and herniations at multiple levels of their spines as the result of minor automobile accidents that could not legitimately have caused the Insureds to suffer those injuries.

104.    For example:

(i)    On August 19, 2019, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured as a result of the accident. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before JC had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of JC's lumbar spine at New York Medical on March 13, 2020, New York Medical, Qureshi, and Imam falsely reported that JC had multiple disc herniations at the L4-L5 and L5-S1 levels of his spine.

(ii)    On November 5, 2019, an Insured named NB was involved in an automobile accident. The contemporaneous police report indicated that NB's vehicle was drivable following the accident. The police report further indicated that NB was not injured as a result of the accident. In keeping with the fact that NB was not seriously injured, NB did not visit any hospital emergency room following the accident. To

the extent that NB experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before NB had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of NB's lumbar spine and cervical spine at New York Medical on January 25, 2020, New York Medical, Qureshi, and Imam falsely reported that NB had multiple disc herniations of the C3-C4, C4-C5, C5-C6, L3-L4, L4-L5, and L5-S1 levels of her spine.

(iii)    On November 13, 2019, an Insured named SB was involved in an automobile accident. The contemporaneous police report indicated that SB's vehicle was drivable following the accident. The police report further indicated that SB refused medical attention. In keeping with the fact that SB was not seriously injured, SB did not visit any hospital emergency room following the accident. To the extent that SB experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before SB had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of SB's lumbar spine and cervical spine at New York Medical on December 17, 2019, New York Medical, Qureshi, and Imam falsely reported that SB had multiple disc herniations at that C3-C4, C4-C5, C5-C6, L4-L5, and L5-S1 levels of her spine.

(iv)    On July 2, 2020, an Insured named DH was involved in an automobile accident. The contemporaneous police report indicated that DH's vehicle was drivable following the accident. The police report further indicated that DH was not injured as a result of the accident. In keeping with the fact that DH not seriously injured, DH did not visit any hospital emergency room following the accident. To the extent that DH experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before DH had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of DH's lumbar spine and cervical spine at New York Medical on August 10, 2020, New York Medical, Qureshi, and Imam falsely reported that DH had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, C7-T1, L3-L4, L4-L5, and L5-S1 levels of his spine.

(v)    On August 26, 2020, an Insured named QA was involved in an automobile accident. The contemporaneous police report indicated that QA's vehicle was drivable following the accident. The contemporaneous hospital records indicated that QA was treated on an outpatient basis and discharged the same day with no serious injury diagnosis. To the extent that QA experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before QA had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of QA's cervical spine

and lumbar spine at New York Medical on October 16, 2020, New York Medical, Qureshi, and Imam falsely reported that QA had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, L4-L5, and L5-S1 levels of her spine.

(vi)     On September 5, 2020, an Insured named LT was involved in an automobile accident. The contemporaneous police report indicated that LT's vehicle was drivable following the accident. The police report further indicated that LT was not injured as a result of the accident. In keeping with the fact that LT was not seriously injured, LT did not visit any hospital emergency room following the accident. To the extent that LT experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before LT had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of LT's lumbar spine and cervical spine at New York Medical on November 2, 2020, New York Medical, Qureshi, and Imam falsely reported that LT had multiple disc herniations of the C3-C4, C4-C5, C5-C6, L3-L4, L4-L5, and L5-S1 levels of her spine.

(vii)    On September 15, 2020, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that SP's vehicle was drivable following the accident. The contemporaneous hospital records indicated that SP was treated on an outpatient basis and discharged the same day after receiving a sprained wrist diagnosis. To the extent that SP experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before SP had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of SP's lumbar spine at New York Medical on November 2, 2020, New York Medical, Qureshi, and Imam falsely reported that SP had multiple disc herniations at the L3-L4, L4-L5, and L5-S1 levels of her spine.

(viii)   On October 5, 2021, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that JS's vehicle was drivable following the accident. The police report further indicated that JS was not injured as a result of the accident. In keeping with the fact that JS was not seriously injured, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before JS had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of JS's cervical spine and lumbar spine at Star Medical on November 16, 2021, Star Medical, Qureshi, and Solomon falsely reported that JS had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, and L5-S1 levels of his spine.

31

(ix)     On November 18, 2021, an Insured named WG was involved in an automobile accident. The contemporaneous police report indicated that WG was not injured as a result of the accident. The police report further indicated that WG was not transported to any hospital emergency department as a result of the accident. To the extent that WG experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before WG had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of WG's cervical spine and lumbar spine at Star Medical on December 22, 2021, Star Medical, Qureshi, and Solomon falsely reported that WG had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, and L5-S1 levels of his spine.

(x)      On November 18, 2021, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that MH was not injured as a result of the accident. The police report further indicated that MH was not transported to any hospital emergency department as a result of the accident. To the extent that MH experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before MH had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of MH's cervical spine and lumbar spine at Star Medical on December 22, 2021, Star Medical, Qureshi, and Solomon falsely reported that MH had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, L2-L3, L3-L4, L4-L5, and L5-S1 levels of his spine.

(xi)     On November 28, 2021, an Insured named BB was involved in an automobile accident. The contemporaneous police report indicated that BB was not injured as a result of the accident. The police report further indicated that BB was not transported to any hospital emergency department following the accident. To the extent that BB experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before BB had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of BB's cervical spine and lumbar spine at Star Medical on January 15, 2022, Star Medical, Qureshi, and Solomon falsely reported that BB had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, L3-L4, and L4-L5 levels of his spine.

(xii)    On November 28, 2021, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that SA was not transported to any hospital emergency department following the accident. To the extent that SA experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before SA had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an

MRI of SA's cervical spine and lumbar spine at Star Medical on January 15, 2022, Star Medical, Qureshi, and Solomon falsely reported that SA had multiple disc herniations at the C5-C6 and L5-S1 levels of her spine.

(xiii)   On January 22, 2022, an Insured named PC was involved in an automobile accident. The contemporaneous police report indicated that PC's vehicle was drivable following the accident. The contemporaneous hospital records indicated that PC was treated on an outpatient basis and discharged the same day with no serious injury diagnosis. To the extent that PC experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before PC had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of PC's cervical spine and lumbar spine at Star Medical on March 22, 2022, Star Medical, Qureshi, and Solomon falsely reported that PC had multiple disc herniations at the C2-C3 and C6-C7 levels of his spine.

(xiv)   On March 15, 2023, an Insured named JT was involved in an automobile accident. The contemporaneous hospital records indicated that JT was treated on an outpatient basis and discharged the same day with no serious injury diagnosis. To the extent that JT experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before JT had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of JT's lumbar spine and cervical spine at New York Medical on April 29, 2023, New York Medical, Qureshi, and Solomon falsely reported that JT had multiple disc herniations at the C3-C4, C4-C5, C5-C6, L3-L4, and L4-L5 levels of her spine.

(xv)   On May 12, 2023, an Insured named WF was involved in an automobile accident. The contemporaneous police report indicated that WFs vehicle was drivable following the accident. The contemporaneous hospital records indicated that WF was treated on an outpatient basis and discharged the same day after receiving a minor soft tissue injury diagnosis. To the extent that WF experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before WF had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of WF's cervical spine and lumbar spine at Star Medical on June 13, 2023, Star Medical, Qureshi, and Solomon falsely reported that WF had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, L3-L4, L4-L5, and L5-S1 levels of her spine.

(xvi)   On May 13, 2023, an Insured named DJ was involved in an automobile accident. The police report indicated that DJ's vehicle was drivable following the accident. The police report further indicated that DJ was not injured as a result of the accident. In keeping with the fact that DJ was not seriously injured, DJ did not visit any hospital

emergency room following the accident. To the extent that DJ experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before DJ had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of DJ's cervical spine and lumbar spine at Star Medical on July 28, 2023, Star Medical, Qureshi, and Solomon falsely reported that DJ had multiple disc herniations at the L4-L5 and L5-S1 levels of his spine.

(xvii)   On July 18, 2023, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that YL's vehicle was drivable following the accident. The police report further indicated that YL refused medical attention a the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before YL had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of YL's lumbar spine and cervical spine at New York Medical on August 27, 2023, New York Medical, Qureshi, and Solomon falsely reported that YL had multiple disc herniations at the C5-C6 and C6-C7 levels of her spine.

(xviii)   On July 23, 2023, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that AC was not injured as a result of the accident. The police report further indicated that AC was not transported to any hospital emergency department following the accident. To the extent that AC experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before AC had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of AC's lumbar spine and cervical spine at New York Medical on August 28, 2023, New York Medical, Qureshi, and Solomon falsely reported that AC had multiple disc herniations at the C3-C4 and C4-C5 levels of his spine.

(xix)   On October 30, 2023, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured as a result of the accident. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before SK had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations. Even so, after purportedly performing an MRI of SK's cervical spine and lumbar spine at Star Medical on November 30, 2023, Star Medical, Qureshi, and Solomon falsely

34

reported that SK had multiple disc herniations at the C3-C4, C4-C5, C5-C6, C6-C7, and L5-S1 levels of her spine.

(xx)    On November 15, 2023, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that AM had complaints of shoulder at the scene but was not transported to any hospital emergency department following the accident. To the extent that AM experienced any health issues at all as a result of the accident, they were minor soft tissue injuries that did not require MRIs, especially before AM had failed a course of conservative treatment, and did not include any disc bulges or herniations, much less multiple disc bulges or herniations.  Even so, after purportedly performing an MRI of AM's cervical spine and lumbar spine at Star Medical on December 21, 2023, Star Medical, Qureshi, and Solomon falsely reported that AM had multiple disc herniations at the C3-C4, C4-C5, C5-C6, and C6-C7 levels of her spine.

105.    These are only representative examples. In the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the Insureds suffered extensive disc bulges and herniations, often at multiple levels of their spines, as the result of minor accidents that could not legitimately have caused the herniations.

106.    The Defendants issued these false and exaggerated "findings" in order to create the appearance of serious injuries where none actually existed, as compensation to their referral sources to ensure a steady stream of referrals to Star Medical and New York Medical for medically unnecessary MRIs.

107.    In addition to falsely reporting disc herniations, the Defendants frequently represented that, as a result of their accidents, the Insureds in the claims identified in Exhibits "1" and "2" suffered from disc bulges that were compressing or indenting their thecal sacs.

108.    A disc bulge is when a spinal disc appears symmetrical, but there is a small outpouching or protrusion of the disc with no significant herniation.

109.    Disc bulges are extremely common, to the point where many adults have a disc bulge at one or more spinal levels without experiencing any symptoms.

110.    There are a number of factors that can cause bulging discs, including – most commonly – the ordinary degenerative changes attendant to aging.

111.    However, it is improbable that a bulging disc actually would be caused by a relatively minor automobile accident.

112.    It is even more improbable that a minor accident actually would cause a patient to suffer from numerous bulging discs at multiple levels of his or her spine.

113.    It is even more improbable – to the point of impossibility – that this legitimately would occur over and over again with great frequency within the cohort of patients being treated at Star Medical and New York Medical.

114.    Even so, in order to create the false appearance that the Insureds in the claims identified in Exhibit "1" and "2" suffered from serious injuries as the result of their typically-minor accidents, and thereby unlawfully compensate their referral sources for medically unnecessary referrals, the Defendants routinely falsely represented that the insureds suffered from multiple disc bulges as a result of their accidents.

115.    What is more, in order to create the false appearance that the purported disc bulges represented a serious condition, the Defendants routinely indicated that virtually every disc bulge was compressing the Insureds' thecal sacs.

116.    Similarly, in the many instances in which the Defendants falsely represented that the Insureds suffered disc herniations as the result of their accidents, the Defendants likewise routinely indicated that the purported disc herniations were compressing the Insureds' thecal sacs.

117.    There was no legitimate reason for the Defendants to report that the Insureds' purported disc bulges or herniations were compressing the Insureds' thecal sacs. Thecal sac "compression" or "indentation" has no clinical significance. These thecal sac "findings" played no

36

role in the diagnoses or treatment of the Insureds and were inserted by the Defendants into their MRI reports solely in order to create the false appearance that the Insureds suffered from serious injuries warranting extensive treatment, when in fact they had not.

118.    In the claims in Exhibits "1" and "2" that involved MRI scans of the Insureds' cervical spines and/or lumbar spines, the Defendants' reports routinely contained exaggerated and/or false interpretations, as well as clinically insignificant "findings", in order to create the false appearance that the Insureds had suffered serious injuries in their accidents, when in fact they had not.

119.    In actuality, and as set forth above, the Insureds' typically minor accidents could not possibly have caused them to suffer bulging or herniated discs at the rate identified by the Defendants.

III.    **The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

120.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms/bills and diagnostic imaging reports through Star Medical and New York Medical to GEICO in New York, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

121.    As described above, the NF-3 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all significant statutory and regulatory requirements governing health care practice and licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, for the reasons set forth herein, the Defendants were not in

compliance with all significant statutory and regulatory requirements governing health care practice in New York and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)     The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and/or licensing laws, and therefore were eligible for PIP reimbursement. In fact, for the reasons set forth herein, the Fraudulent Services were not provided in compliance with all significant statutory and regulatory requirements governing health care practice in New York and/or licensing laws, and therefore were not eligible for PIP reimbursement.

(iii)    The bills and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not legitimately performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)    The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the results of the Fraudulent Services, and the reimbursable amounts for the Fraudulent Services.

(v)     The bills and treatment reports submitted or caused to be submitted by the Defendants often falsely represented that Star Medical and New York Medical were entitled to PIP reimbursement for the Fraudulent Services, when in fact they were not because the Fraudulent Services had been performed – to the extent that they were performed at all – by independent contractors.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

122.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

123.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

124.    For instance, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided at Star Medical and New York Medical – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent protocols designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

125.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were legitimately performed in the first instance.

126.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they were performed at all, by independent contractors.

127.    GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $9,500,000.00.

128.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Star Medical**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

129.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

130.    There is an actual case in controversy between GEICO and Star Medical regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through Star Medical.

131.    Because of the fraudulent and unlawful scheme described herein, Star Medical is not entitled to receive payment on the outstanding billing it has submitted to GEICO.

132.    Accordingly, GEICO also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Star Medical is not entitled to receive payment on the outstanding billing it has submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Qureshi, Solomon, and Imam**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

133.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

134.    Star Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

135.    Qureshi, Solomon, and Imam knowingly conducted and/or participated, directly or indirectly, in the conduct of Star Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Star Medical was not

eligible to receive under the no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not legitimately performed at all; (iv) the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Star Medical's employees; and (vi) neither Star Medical nor the underlying services were in compliance with relevant laws and regulations regarding health care practice, including licensing laws.

136.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

137.    Star Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Qureshi, Solomon, and Imam operated Star Medical, inasmuch as Star Medical was not engaged in a legitimate health care practice and acts of mail fraud therefore were essential in order for Star Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Star Medical continues to attempt collection on the fraudulent billing submitted through Star Medical to the present day.

138.    Star Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Star Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

41

139.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,190,000.00 pursuant to the fraudulent bills submitted through the Star Medical enterprise.

140.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Qureshi, Solomon, Imam, and Azar**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

141.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

142.    Star Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

143.    Qureshi, Solomon, Imam, and Azar employed by or associated with the Star Medical enterprise.

144.    Qureshi, Solomon, Imam, and Azar knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Star Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Star Medical was not eligible to receive under the no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not

legitimately performed at all; (iv) the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Star Medical's employees; and (vi) neither Star Medical nor the underlying services were in compliance with relevant laws and regulations regarding health care practice, including licensing laws.

145.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

146.    Qureshi, Solomon, Imam, and Azar knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

147.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,190,000.00 pursuant to the fraudulent bills submitted through the Star Medical enterprise.

148.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Star Medical, Qureshi, Solomon, Imam, and Azar
### (Common Law Fraud)

149.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

150.    Star Medical, Qureshi, Solomon, Imam, and Azar intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Star Medical for the Fraudulent Services.

151.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) the representation that the Fraudulent Services were provided in the first instance, when in many cases they were not; and (iii) the representation that the Defendants entitled to receive no-fault reimbursement for the Fraudulent Services, when in fact they were not.

152.    Star Medical, Qureshi, Solomon, Imam, and Azar intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Star Medical that were not reimbursable.

153.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,190,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Qureshi, Solomon, Imam, and Azar through Star Medical.

154.    Star Medical, Qureshi, Solomon, Imam, and Azar's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

155.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Star Medical, Qureshi, Imam, and Azar
### (Unjust Enrichment)

156.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

157.    As set forth above, Star Medical, Qureshi, Solomon, Imam, and Azar have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

158.    When GEICO paid the bills and charges submitted or caused to be submitted by Qureshi, Solomon, Imam, and Azar through Star Medical, it reasonably believed that it was legally obligated to make such payments based on Star Medical, Qureshi, Solomon, Imam, and Azar's improper, unlawful, and/or unjust acts.

159.    Star Medical, Qureshi, Solomon, Imam, and Azar have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Star Medical, Qureshi, Solomon, Imam, and Azar voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

160.    Star Medical, Qureshi, Solomon, Imam, and Azar's retention of GEICO's payments violated fundamental principles of justice, equality, and good conscience.

161.    By reason of the above, Star Medical, Qureshi, Solomon, Imam, and Azar have been unjustly enriched in an amount to be determined at trial, but in no event less than $4,190,000.00.

## SIXTH CAUSE OF ACTION
### Against New York Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

162.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

163.    There is an actual case in controversy between GEICO and Star Medical regarding more than $75,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO through New York Medical.

164.    Because of the fraudulent and unlawful scheme described herein, New York Medical is not entitled to receive payment on the outstanding billing it has submitted to GEICO.

165.    Accordingly, GEICO also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that New York Medical is not entitled to receive payment on the outstanding billing it has submitted to GEICO.

### SEVENTH CAUSE OF ACTION
**Against Qureshi, Solomon, and Imam**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

166.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

167.    New York Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

168.    Qureshi, Solomon, and Imam conducted and/or participated, directly or indirectly, in the conduct of New York Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that New York Medical was not eligible to receive under the no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not legitimately performed at all; (iv) the billed-for services were

46

provided – to the extent that they were provided at all – by independent contractors, rather than by New York Medical's employees; and (vi) neither New York Medical nor the underlying services were in compliance with relevant laws and regulations regarding health care practice, including licensing laws.

169.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

170.    New York Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Qureshi, Solomon, and Imam operated New York Medical, inasmuch as New York Medical was not engaged in a legitimate health care practice and acts of mail fraud therefore were essential in order for New York Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that New York Medical continues to attempt collection on the fraudulent billing submitted through New York Medical to the present day.

171.    New York Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by New York Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

172.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills submitted through the New York Medical enterprise.

173.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Qureshi, Solomon, Imam, and Azar**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

174.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

175.    New York Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

176.    Qureshi, Solomon, Imam, and Azar are employed by or associated with the New York Medical enterprise.

177.    Qureshi, Solomon, Imam, and Azar knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of New York Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that New York Medical was not eligible to receive under the no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not legitimately performed at all; (iv) the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by New York Medical's employees; and (vi) neither New York Medical nor the underlying services were in

48

compliance with relevant laws and regulations regarding health care practice, including licensing laws.

178.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

179.     Qureshi, Solomon, Imam, and Azar knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

180.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills submitted through the New York Medical enterprise.

181.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against New York Medical, Qureshi, Solomon, Imam, and Azar**
**(Common Law Fraud)**

182.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

183.     New York Medical, Qureshi, Solomon, Imam, and Azar intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through New York Medical for the Fraudulent Services.

184.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) the representation that the Fraudulent Services were provided in the first instance, when in many cases they were not; and (iii) the representation that the Defendants entitled to receive no-fault reimbursement for the Fraudulent Services, when in fact they were not.

185.    New York Medical, Qureshi, Solomon, Imam, and Azar intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through New York Medical that were not reimbursable.

186.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,400,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Qureshi, Solomon, Imam, and Azar through New York Medical.

187.    New York Medical, Qureshi, Solomon, Imam, and Azar's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

188.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
**Against New York Medical, Qureshi, Solomon, Imam, and Azar**
**(Unjust Enrichment)**

189.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-128 above.

190.    As set forth above, New York Medical, Qureshi, Solomon, Imam, and Azar have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

191.    When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants through New York Medical, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

192.    New York Medical, Qureshi, Solomon, Imam, and Azar have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

193.    New York Medical, Qureshi, Solomon, Imam, and Azar's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

194.    By reason of the above, New York Medical, Qureshi, Solomon, Imam, and Azar have been unjustly enriched in an amount to be determined at trial, but in no event less than $5,400,000.00.

**JURY DEMAND**

195.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Star Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Star Medical has no right to receive payment for any pending bills submitted to GEICO.

B.    On the Second Cause of Action against Qureshi, Solomon, and Imam, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

51

$4,190,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

C.    On the Third Cause of Action against Qureshi, Solomon, Imam, and Azar, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,190,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

D.    On the Fourth Cause of Action against Star Medical, Qureshi, Solomon, Imam, and Azar compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,190,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

E.    On the Fifth Cause of Action against Star Medical, Qureshi, Solomon, Imam, and Azar compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $4,190,000.00, plus costs, interest and such other and further relief as this Court deems just and proper.

F.    On the Sixth Cause of Action against New York Medical for a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that New York Medical has no right to receive payment for any pending bills submitted to GEICO.

G.    On the Seventh Cause of Action against Qureshi, Solomon, and Imam, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $5,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

H.    On the Eighth Cause of Action against Qureshi, Solomon, Imam, and Azar, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$5,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

     I.   On the Ninth Cause of Action against New York Medical, Qureshi, Solomon, Imam, and Azar, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $5,400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

     J.   On the Tenth Cause of Action against New York Medical, Qureshi, Solomon, Imam, and Azar, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $5,400,000.00, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: November 19, 2024

RIVKIN RADLER LLP

By:    /s/ *Max Gershenoff*
        Barry I. Levy, Esq. (BL 2190)
        Max Gershenoff, Esq. (MG 4648)
        Peter Henninger, Esq. (PH 4482)
        926 RXR Plaza
        Uniondale, New York 11556
        (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*